United States District Court
Southern District of Texas
**ENTERED**
October 12, 2021
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DELIA RIOS CANALES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-00168 |
| | § | |
| ANDREW SAUL, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Delia Rios Canales filed this action pursuant to 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny her application for Social Security disability benefits. Now pending are Canales' and the Commissioner's construed cross-motions for summary judgment (D.E. 16, 17).[1] Canales first contends that the Administrative Law Judge ("ALJ") failed to include all of her physical limitations in the hypothetical asked to the vocational expert and the ultimate residual functional capacity ("RFC") determination. Second, she argues that the ALJ improperly rejected opinions regarding her mental limitations and did not include all relevant limitations in the mental RFC determination. For the reasons discussed further below, it is recommended that Canales' motion for summary judgment (D.E. 16) be

---

[1] Neither party labeled their briefing as a motion for summary judgment. However, based on the contents of each brief and the procedural posture of this social security appeal, the undersigned construes them as such. Canales also filed a statement of supplemental authorities. (D.E. 18).

granted, the Commissioner's motion for summary judgment (D.E. 17) be denied, and the Commissioner's denial of disability benefits be reversed and remanded for further consideration.

## I.    JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because Canales resides in Nueces County, Texas.  42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(6).

## II.    BACKGROUND & ADMINISTRATIVE RECORD

### a.  Application and Hearing

In September 2017, Canales filed an application for disability insurance benefits, alleging a disability commencing on May 4, 2016.  (D.E. 13-6 at 2-3).[2]  In relevant part, Canales claimed that her fibromyalgia, bipolar disorder, depression, osteoarthritis, anxiety, and back pain limited her ability to work.  (D.E. 13-4 at 3, 7).  The Commissioner denied Canales' application both initially and on reconsideration.  (D.E. 13-4 at 17, 43).

In the Disability Determination Explanation at the initial stage, state medical consultant Dr. Mark Schade concluded that Canales suffered from: (1) depressive, bipolar, and related disorders; (2) anxiety and obsessive-compulsive disorders; and (3) somatic symptom and related disorders.  (D.E. 13-4 at 8).  When analyzing the Paragraph B criteria of the Listings, Dr. Schade concluded that Canales had: (1) moderate restrictions in her ability to understand, remember, or apply information; (2) mild limitations in her ability to

---

[2] Canales initially alleged that her disability commenced on April 29, 2016, but this was later changed to May 4.  (D.E. 13-6 at 25).

2

interact with others; and (3) moderate limitations in her ability to concentrate, persist, or maintain pace.  (*Id.*).   In his RFC assessment, Dr. Schade concluded that Canales was: (1) moderately limited in her ability to understand and remember detailed instructions; (2) moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods; (3) moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) moderately limited in her ability to interact appropriately with the general public.  (*Id.* at 13-14).   Dr. Schade stated that Canales could "understand, remember, and carry out detailed, but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting."  (*Id.* at 14).

As to physical limitations, state medical consultant Dr. Patty Rowley concluded that Canales would be limited to occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, about 6 hours of walking or sitting per workday (with normal breaks), and an unlimited amount of pushing or pulling.  (*Id.* at 10).  She could only occasionally stoop, crawl, and climb ladders, ropes, or scaffolds, but her ability to climb ramps and stairs, balance, kneel, and crouch was unlimited.  (*Id.* at 10-11).  Her ability to reach overhead was limited in both directions and she could only do so occasionally.  (*Id.* at 11).

In the Disability Determination Explanation at the reconsideration stage, state medical consultant Dr. Richard Kaspar concluded that Canales suffered from the same

mental disorders as found by Dr. Schade.  (*Id.* at 32).  When analyzing the Paragraph B criteria of the Listings, Dr. Kaspar concluded that Canales had the same moderate limitations identified at the initial level, along with a moderate limitation in her ability to adapt or manage herself.  (*Id.*).  In his RFC assessment, Dr. Kaspar found the same limitations as Dr. Schade.  (*Id.* at 38-39).  Similarly, Dr. Charles K. Lee found the same physical limitations as Dr. Rowley in his RFC assessment.  (*Id.* at 35-37).  Dr. Lee also found that Canales needed to avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights.  (*Id.* at 36-37).

At the hearing before the ALJ on April 19, 2019, Canales testified to the following. She quit her previous job as a customer service representative in December 2013 because she could not concentrate, was making too many mistakes, and had run out of medical leave.  (D.E. 13-3 at 53).  Her issues with working were caused by her anxiety, bipolar disorder, fibromyalgia, and osteoarthritis.  (*Id.* at 54).  She could not concentrate due to pain in her neck and was unable to sit for long periods.  (*Id.*).  She eventually had a fusion surgery on her neck.  (*Id.* at 56-57).  However, even after the surgery, she could not turn her head correctly and still had pain.  (*Id.* at 57).  She had also been diagnosed with depression and anxiety.  (*Id.* at 58).  At her previous job, there were days when she would drive to work and sit in her car, but then go back home without ever going in due to anxiety attacks.  (*Id.*).  She still had anxiety attacks that were triggered by going out in public.  (*Id.* at 59).  Due to insomnia, she also had difficulty sleeping.  (*Id.*).  If she sat for too long, she had lower back pain and sciatic nerve pain.  (*Id.* at 59-60).  Walking was difficult and she used a cane.  (*Id.* at 60).  It seemed to her like her neck pain, hip pain, and lower back pain

all got worse after her neck surgery. (*Id.*). The cane was not prescribed by a doctor, but her doctor had seen her using it. (*Id.* at 61). She could not lift more than 10 pounds due to shoulder and elbow problems. (*Id.*). She could only stand for 10 minutes at a time. (*Id.* at 62).

A vocational expert identified Canales' past relevant work as a customer service representative. (*Id.* at 64). The ALJ asked the vocational expert whether a hypothetical person with the same age, education, and work experience as Canales could perform her past relevant work if they also: (1) were limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; (2) could not climb ladders, ropes, or scaffolds; (3) were limited to only occasional bilateral overhead reaching; (4) were required to alternate between sitting and standing every 30 minutes and had to use a cane to walk; (5) must avoid concentrated exposure to extreme cold temperatures, vibrations, and hazards including dangerous and moving machinery and unprotected heights; (6) could understand, carry out, and remember simple and routine instructions, make simple decisions, and attend and concentrate for two hours at a time; (7) could occasionally interact with the public, supervisors, and coworkers; and (8) could respond appropriately to occasional routine changes in work setting. (*Id.* at 64-65). The vocational expert testified that this person could not perform Canales' past relevant work. (*Id.* at 65). This person could perform jobs such as final inspector, hand packager, or laundry sorter. (*Id.*). However, if the person also would have two or more unexcused or unscheduled absences per month, they would not be able to perform any jobs in the national economy.

(*Id.* at 65-66).  Similarly, there would be no jobs if the person would be off-task more than ten percent of the work day in addition to the regularly scheduled breaks.  (*Id.* at 66).

### b. Medical Records

On January 12, 2016, Canales visited the doctor and complained of bilateral back and neck pain.  (D.E. 13-8 at 10).  She was prescribed medication and referred for physical therapy.  (*Id.* at 12).

On January 26, 2016, Canales had a mental health appointment where she indicated that she was concerned about going to physical therapy because previous attempts at therapy had made her pain worse.  (D.E. 13-9 at 69).  She was in treatment for depression and anxiety in the context of chronic pain.  She was more depressed than at her previous appointment and thought that she would be better off dead, but had no suicidal intent.  (*Id.*). Her general appearance was glum and sad, but she was well-groomed and cooperative.  (*Id.* at 70).  Her gait was slow and careful.  Her affect was depressed with a congruent mood. Her speech was soft and laconic.  (*Id.*).  All other areas were unremarkable.  (*Id.* at 70-71). She was prescribed medication for depression and anxiety.  (*Id.* at 74).

On June 7, 2016, Canales visited the doctor and complained of knee pain, neck pain, and upper and lower back pain.  (D.E. 13-11 at 30).  Tests on June 23, 2016, showed heavy calcifications of degenerative change along Canales' cervical spine.  (D.E. 13-9 at 33). There was mild spondylosis of the lumbar spine, but no acute bony abnormality.  (*Id.* at 35).

She again visited the doctor on March 13, 2017, to follow-up on her general aches and pains.  (D.E. 13-11 at 15).  Canales reported that all of her pain was getting worse.

(*Id.*).  Her hips hurt a lot and she could not walk much.  (*Id.* at 17).  She had neck pain every day and her head felt too heavy for her neck.  (*Id.*).  Tests on March 29, 2016, showed moderate degenerative joint disease of both hips.  (*Id.* at 52).

On August 7, 2017, Canales visited the doctor to follow up on her bipolar disorder, but also complained of left hip pain.  (D.E. 13-11 at 10).  Canales indicated that everything hurt, including her neck and lower back.  (*Id.* at 12).  It felt like her hip was being pulled. Her pain was a 9 out of 10, but it was a 7 on most days.  She had not attended physical therapy.  (*Id.*).  She was depressed and had an abnormal affect.  (*Id.* at 13).  She had a limited range of motion in her cervical and lumbar spines.  Her balance was good, but she had an irregular gait.  (*Id.*).  Tests on August 10, 2017, showed moderate spinal stenosis changes in her lumbar spine at L4-5 and a small disc protrusion on the right side at L5-S1. (*Id.* at 43-44).  In her cervical spine, there was asymmetric spondylosis and disc protrusion on the right side at C6-7, broad-based disc bulge and spondylosis at C5-6 with moderate spinal canal narrowing, prominent disc bulge at C4-5, and mild disc bulge a C3-4.  (*Id.* at 45-46).  Tests on August 14, 2017, showed that Canales had moderate-to-severe osteoarthritis of the bilateral hips, small bilateral hip joint effusions, and degenerative fraying of the anterior superior labrum bilaterally, among other issues.  (*Id.* at 39-40).

On August 16, 2017, Canales visited Dr. Melissa Macias following a referral for consultation and evaluation of her lower back pain.  (D.E. 13-10 at 14).  Canales reported that she had a ten-year history of pain that had become more severe and was now continuous.  The pain was an 8 out of 10 and she described it as stabbing or squeezing. (*Id.*).  Conservative measures were discussed, including physical therapy, analgesics, and

referral to pain management for cervical and lumbar injections, but no pain management doctor was accepting Canales' insurance. (*Id.* at 19). Canales was also encouraged to lose weight. Surgery was offered for Canales' cervical spine, and future surgery in her lumbar spine was also a possibility. (*Id.*).

On September 21, 2017, Canales underwent an anterior cervical decompression and fusion surgery without complication. (D.E. 13-13 at 8). She was discharged the same day. (*Id.*). On October 2, 2017, Canales met with Dr. Macias to follow-up after the surgery. (*Id.* at 7). Canales indicated that she was pleased with the surgical outcome to that point. (*Id.*). She again visited Dr. Macias on October 18, 2017, and she was recovering as anticipated. (D.E. 13-11 at 83).

Canales stated the following in a function report dated October 27, 2017. (D.E. 13-7 at 24-31). She was unable to stand or sit for long periods of time. (*Id.* at 24). She did not like to be around others because of her anxiety, and she had panic attacks that made her irritable. She was in constant pain, and the medications she took made her tired. (*Id.*). She needed help to put on underwear, got exhausted while bathing, had difficulty caring for her hair because of pain in her shoulder, and had trouble getting off the toilet. (*Id.* at 25). She did not need reminders to take care of personal needs and grooming, but she did need reminders to take medication. (*Id.* at 25-26). She did not prepare her own meals because she could not stand. (*Id.* at 26). She was able to do light sweeping around the house, with help from her husband. (*Id.*). She could not go out alone because she got anxious. (*Id.* at 27). She could not drive because her car was a manual and her arm pain prevented her from shifting. She did not do any shopping. She was able to pay bills, count

8

change, handle a savings account, and use a checkbook.  (*Id.*).  She was no longer able to fish or swim because she could not sit long enough to fish and her arthritis and fibromyalgia prevented her from swimming.  (*Id.* at 28).  She talked with other people daily and went to church at least once a week.  (*Id.*).  She did not have trouble getting along with family, friends, neighbors, or others.  (*Id.* at 29).  She could walk for five minutes without rest and could pay attention for five to ten minutes.  She had trouble understanding written instructions and could not follow spoken instructions at all.  (*Id.*).  She did not adapt well to changes in routine.  (*Id.* at 30).

On November 13, 2017, Canales visited Dr. K. Eric DuBois, a psychologist, for a clinical interview and mental status examination.  (D.E. 13-12 at 31-42).  Canales reported her problems as severe pain, bipolar disorder, depression, and anxiety.  (*Id.* at 32).  She sometimes stayed awake for two days if she did not take her medication.  (*Id.*).  Dr. DuBois noted that Canales needed to have several questions repeated during the interview and also had to be re-directed several times because she began to discuss her pain symptoms.  (*Id.* at 37).  She was appropriately dressed for the interview and had adequate hygiene, but her behavior was subdued.  (*Id.* at 39).  Her body movements were stiff and slow, and she appeared uncomfortable in her posturing.  Her speech varied from normal range to low and slow, and she had to repeat her responses several times.  (*Id.*).  She was cooperative during the interview, her thought process was goal-directed and logical, she had no suicidal intent or plan, she had no hallucinations, her eye contact was good, she was oriented to person, place, time, and situation, her level of intelligence seemed average, her concentration was basically intact, her judgment was fairly good, and she had some insight about her mental

disorders.  (*Id.* at 39-40).  However, her recent memory was impaired because she could not recall any of four words given to her after a five-minute delay, and she was unable to manage her symptoms of pain, depression, and anxiety.  (*Id.* at 40).  Dr. DuBois diagnosed Canales with somatic symptom disorder, persistent depressive disorder, social anxiety disorder, and generalized anxiety disorder.  (*Id.* at 40-42).  He concluded that she was not capable of working due to her pain, which affected her concentration and focus.  (*Id.* at 42).  She could not effectively help her depression and anxiety symptoms, and her ability to carry out tasks with one or two step oral instructions and use reasoning and judgment to make work-related decisions were impaired.  (*Id.*).

On November 14, 2017, Canales visited Dr. Christopher L. Klaas, a psychologist, for a second clinical interview and mental status examination.  (*Id.* at 46-49).  Dr. Klaas stated that Canales was able to organize her thoughts and maintain focus with some difficulty.  (*Id.* at 47).  Canales was cooperative and agreeable, and her statements were softly spoken, mostly logically sequenced, and adequately expanded.  (*Id.* at 48).  Her statements included a few tangential references and her verbal reasoning was fair.  Her comments were sensible and Dr. Klaas could follow her reasoning.  She was oriented as to time, place, and person.  (*Id.*).  Dr. Klaas had to repeat a few questions, but Canales was attentive.  (*Id.* at 49).  Her insight and judgment were maintained.  Dr. Klaas diagnosed Canales with moderately severe bipolar disorder and moderately severe somatic symptom disorder with predominant pain.  Dr. Klaas concluded that Canales had the ability to understand and remember instructions and apply information for a one or two step activity and with more complex tasks.  She had diminished ability to get along with supervisors,

co-workers, and the general public. Her concentration was maintained, but she struggled with details, staying on tasks, and working at a sustained rate. She also had constraints in being able to effectively control, regulate, and modulate her behavior and emotions and maintain her well-being in a work setting. (*Id.*).

On November 14, 2017, Canales visited Dr. Macias to follow-up after surgery. (D.E. 13-15 at 16). She was recovering as anticipated. Her radicular pain was resolved, but she still had occasional numbness and tingling in her hands and fingers. Her neck pain was improved, but she still reported musculoskeletal pain in her neck. (*Id.*). Dr. Macias recommended physical therapy. (*Id.* at 21).

In a December 14, 2017, survey regarding her neck pain, Canales indicated that: (1) her pain was severe but came and went; (2) it was painful to look after herself and she was slow and careful; (3) pain prevented her from lifting heavy weights, but she could manage light to medium weights if they were conveniently positioned; (4) she could not read as much as she wanted due to her neck pain; (5) she had frequent severe headaches; (6) she could not concentrate at all; (7) she could hardly do any work at all; (8) she could not drive for as long as she wanted due to neck pain; (9) her sleep was greatly disturbed; and (10) she could not do any recreational activities. (D.E. 13-14 at 27). She completed six weeks of physical therapy, but consistently reported pain. (*See id.* at 11-14, 31-43).

Tests on January 19, 2018, showed that Canales had a mild diffuse disc bulge in her cervical spine at the C7-T1 level, but no significant spinal stenosis. (D.E. 13-13 at 45).

On January 24, 2018, Canales visited Dr. Macias for a follow-up and reported headaches and mild neck pain that were treated well with her pain medication and muscle

11

relaxers. (D.E. 13-15 at 9). She had an episode where she had pain in her upper extremities and numbness, but the symptoms had improved. (*Id.*). Her cervical range of motion was still limited secondary to pain and muscle stiffness or spasms. (*Id.* at 14). Dr. Macias concluded that Canales was doing well overall after surgery. (*Id.*).

On February 7, 2018, Canales visited her doctor to follow-up on her chronic pain. (D.E. 13-16 at 41). Canales reported that she was "not good" and could not drive because she could not turn her head after the surgery. (*Id.* at 44). Her hands were still falling asleep and she had numbness, tingling, and shooting pains. Canales could not walk and felt like there was something in her left hip. She also had lower back pain. She was depressed and had an abnormal affect. (*Id.*). The doctor prescribed further medication, recommended weight loss, and recommended further physical therapy for both her hip and cervical spine issues. (*Id.* at 45-46).

On March 19, 2018, Canales returned to physical therapy and continued going for several months. (D.E. 13-18 at 12-30).

On March 26, 2018, Canales met with a mental health counseling intern. (D.E. 13-17 at 27). Canales reported that she did not want to live anymore, but that she would not commit suicide. She was sad and depressed every day. Her anxiety medication was not helping and she did not want to go anywhere. She had violent thoughts, but also reported that she often said things she did not mean. (*Id.*).

On April 4, 2018, Canales visited her doctor complaining of bilateral lower back pain that was made worse after physical therapy. (D.E. 13-22 at 25, 28). The pain was a 10 out of 10. (*Id.* at 28). The doctor adjusted her medications and ordered a back brace.

12

(*Id.* at 29-30).  Canales returned to the doctor on April 19, 2018, again with back pain.  (*Id.* at 21).  The doctor again adjusted her medications.  (*Id.* at 25).

On May 7, 2018, Canales visited an orthopedic doctor for her hip pain.  (D.E. 13-17 at 45).  The doctor noted that she was using a cane.  (*Id.*).  She had a severe limitation of rotation in both sides accompanied with pain.  (*Id.* at 48).  The doctor noted that her tests were consistent with osteoarthritis, but that she was very young and overweight to be a candidate for total hip replacement.  However, he noted that she would probably need to consider surgery eventually.  (*Id.*).  Tests showed that she had no acute fracture or dislocation, moderate degenerative changes of the bilateral hips, and rounded calcified densities adjacent to the right femoral neck that may reflect loose bodies.  (*Id.* at 64).

On May 30, 2018, Canales returned to the doctor regarding her hip pain.  (*Id.* at 50).  She reported that the pain was an 8 out of 10, she had pain with weight-bearing and range of motion, especially when changing position from sitting down or standing up.  She denied numbness or tingling.  (*Id.*).  The doctor recommended weight loss, exercises focused on allowing joints to glide, and a cortisone injection.  (*Id.* at 54).

On June 12, 2018, Canales attended a mental health appointment.  (*Id.* at 20).  She reported that she had a bad temper and sometimes had difficulty sleeping.  (*Id.*).  The provider and Canales developed goals and objectives to help her with her depression and anxiety symptoms, along with her temper.  (*Id.* at 22, 37).

On June 14, 2018, Canales got a steroid injection in her left hip.  (D.E. 13-18 at 8).  Tests on her thoracic spine showed moderated degenerative changes, but normal alignment and no acute fractures.  (*Id.* at 10).

13

On July 10, 2018, Canales had a mental health appointment.  (D.E. 13-17 at 25).
She reported that her depression had increased over the previous quarter.  She thought her
temper had improved a bit, but everything still seemed to bother her.  She denied suicidal
ideations and auditory or visual hallucinations.  (*Id.*).

On July 10, 2018, Canales also visited her doctor, complaining of left leg, knee,
foot, buttocks, and hip pain.  (D.E. 13-21 at 51).  She reported that the surgeon said she
needed to lose weight before having a hip surgery.  She was unable to go to physical therapy
due to pain.  (*Id.*).

On July 12, 2018, Canales had a mental health appointment.  (D.E. 13-17 at 10).
She described her mood as frustrated and reported similar feelings of anxiety and
depression as in previous visits.  (*Id.*).  She was well-groomed and cooperative, but had a
blunted behavior.  (*Id.* at 12).  Her gait was slow and she used a cane.  She was depressed
and had a congruent affect.  Sometimes she wished she was dead, but she had no plan or
intent.  (*Id.*).  All other psychiatric factors and cognitive functions were unremarkable.  (*Id.*
at 12-13).  She was prescribed medication.  (*Id.* at 15).

Canales stated the following in a function report dated August 1, 2018.  (D.E. 13-7
at 43-51).  She could not walk for even a short distance.  (*Id.* at 43).  She could not go
anywhere except for doctor's appointments and church, she did not visit anyone, she could
not shower every day, and she could not drive because she was scared to go out.  (*Id.*).  Her
conditions affected her sleep and caused her to wake up frequently.  (*Id.* at 44).  Most days
she stayed in her pajamas.  She had a hard time bathing, caring for her hair, and using the
toilet.  (*Id.*).  She needed reminders to take medication.  (*Id.* at 45).  She did not prepare

14

her own meals because she could not stand for over 5 minutes.  She had trouble folding laundry.  (*Id.*).  She did not go outside because she felt like she would have an anxiety attack.  (*Id.* at 46).  She could not drive because it made her nervous and she could not turn her neck.  She shopped by phone and computer.  (*Id.*).  She was able to pay bills, count change, handle a savings account, and use a checkbook, but she often lost money.  (*Id.* at 46-47).  She watched television.  (*Id.* at 47).  She went to church once or twice a month.  (*Id.*).  She had trouble getting along with neighbors and did not go anywhere because she became anxious.  (*Id.* at 48).  She could only walk for five minutes, could not pay attention for very long, and could not follow written or spoken instructions well.  (*Id.*).  She got along well with authority figures.  (*Id.* at 49).  She could not handle stress or changes in routine.  She used a cane.  (*Id.*).

On August 8, 2018, Canales visited the doctor regarding her hip pain and indicated that the steroid injection had not helped.  (D.E. 13-17 at 58).  The doctor recommended that she continue with medication and weight loss plan and return for potential surgery when her body mass index was lower.  (*Id.* at 63).

Tests on August 20, 2018, indicated that there was no significant abnormality in Canales' cervical spine, although hardware related to her prior surgery prevented a detailed evaluation of some sections.  (D.E. 13-22 at 60).

On October 5, 2018, Canales had a mental health appointment.  (D.E. 13-20 at 14).  She reported similar depression and anxiety symptoms as at previous visits.  (*Id.*).  The doctor adjusted her medication.  (*Id.* at 19).

Tests on October 26, 2018, indicated that Canales' lumbar spine had multifocal broad-based posterior disc bulge and disc protrusions at L4-L5 with moderate thecal sac stenosis, a small disc protrusion on the right at L5-S1, and a partially visualized posterior disc protrusion at T12-L1 with mild thecal sac stenosis.  (D.E. 13-22 at 54-55).

On January 10, 2019, Canales had a mental health appointment where she reported suicidal thoughts and intent without a specific plan.  (D.E. 13-20 at 32).  She indicated that she thought about swallowing all of her pills around once a week, and sometimes when she took more than prescribed, she was disappointed when she woke up.  (*Id.*).  She and the provider developed a stronger safety plan.  (*Id.* at 46).

On February 11, 2019, Canales visited the doctor regarding her chronic back pain. (D.E. 13-21 at 8).  She received an injection and other medication.  (*Id.* at 12).

### c.  ALJ Decision

On May 22, 2019, the ALJ issued an opinion, concluding that Canales was not under a disability since May 4, 2016.  (D.E. 13-3 at 16-29).  At the first step of the sequential evaluation process, the ALJ concluded that Canales had not engaged in substantial gainful activity from the alleged onset date of May 4, 2016, through her date last insured of December 31, 2018.  (*Id.* at 18).

At the second step, the ALJ concluded that Canales had several severe impairments that limited her ability to perform basic work activities, including: degenerative disc disease, obesity, fibromyalgia, degenerative joint disease, bipolar disorder, anxiety, and somatic symptom disorder.  (*Id.*).

16

At the third step, the ALJ concluded that Canales did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.* at 19-21).  Specifically as to Canales' mental impairments, the ALJ noted that, in order to meet the Paragraph B criteria, the mental impairments must result in at least one extreme limitation or two marked limitations in a broad area of functioning.  (*Id.* at 19-20).  The ALJ concluded that Canales had no more than moderate limitations in any broad area of functioning.  (Id. at 20).  The ALJ noted that the Paragraph B criteria were not the same as the RFC determination, which only applied to steps four and five of the sequential evaluation.  (*Id.* at 20-21).

The ALJ concluded that Canales had the residual functional capacity ("RFC") to perform light work, with the following limitations: (1) she could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; (2) she could never climb ladders, ropes, or scaffolds; (3) she could occasionally engage in bilateral overhead reaching; (4) she required an option to alternate sitting and standing at 30 minute intervals; (5) she required a cane for ambulation; (6) she was required to avoid concentrated exposure to extreme cold temperatures, vibrations, and hazards; (7) she could understand, carry out, and remember simple, routine instructions; (8) she could make simple decisions; (9) she could attend and concentrate for two hours at a time; (10) she could occasionally interact with the public, supervisors, and coworkers; and (11) she could respond appropriately to occasional, routine changes in a work setting.  (*Id.* at 21).

In reaching this conclusion, the ALJ found that Canales' medically determinable impairments could be expected to cause the symptoms that Canales alleged, but that her

statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical and other evidence in the record.  (*Id.* at 22).  As to her physical impairments, the ALJ noted that she had struggled with cervical spine issues and underwent surgery, which improved her neck pain and limitations, but was followed by worsening hip, knee, and back pain.  (*Id.*).  The ALJ summarized the medical evidence related to Canales' spine, hip, and other physical impairments.  (*Id.* at 21-24).  As to her mental impairments, the ALJ concluded that Canales treated them with medication and that they appeared to be generally stable.  (*Id.* at 24).

The ALJ stated that the physical RFC determination was consistent with the findings of the state agency medical consultants, but he found their opinions only partially persuasive to the extent they failed to include that Canales needed a cane to ambulate and that her obesity and fibromyalgia required additional environmental limitations.  (*Id.* at 26).  For the mental RFC, the ALJ found the opinions of the two state agency medical consultants to be not very persuasive because Canales indicated at most moderate limitations in any area of functioning at the hearing, and she also needed social limitations included in the RFC.  (*Id.*).  The ALJ found Dr. DuBois's opinion to be not persuasive because the extreme limitations were not supported by Dr. Klaas' findings or the mental health treatment notes.  (*Id.* at 26-27).  Finally, the ALJ found Dr. Klaas' findings to be persuasive because they were supported by the treating source records, the state agency medical consultants, and Canales' hearing testimony and pre-hearing statements.  (*Id.* at 27).

At step four, the ALJ concluded that, based on her RFC, Canales was unable to perform any past relevant work.  (*Id.* at 27).  However, at step five, the ALJ concluded that, based on her RFC, age, education, and work experience, Canales would be able to work in other occupations that existed in significant numbers in the national economy.  (*Id.* at 28).  Specifically, the ALJ identified the jobs of final inspector, hand packager, and laundry sorter.  (*Id.*).  Thus, the ALJ concluded that Canales was not under a disability between May 4, 2016, and December 31, 2018.  (*Id.* at 29).

The Appeals Council denied Canales' request for review of the ALJ's decision. (D.E. 13-3 at 2-4).

## III.  DISCUSSION

> *a.  Whether substantial evidence supported the ALJ's RFC determination where he recognized limitations to the range of motion in Canales' spine and hips, but did not include such limitations in the RFC determination or hypothetical asked to the vocational expert*

In her motion for summary judgment, Canales first contends that the medical evidence established that she has a limited range of motion in her neck and severe osteoarthritis of her hips, but the ALJ failed to include any limitation in range of motion of the cervical spine or hips in the RFC determination or the hypothetical question to the vocational witness.  (D.E. 16 at 10-11).  She argues that the ALJ was required to include these limitations in the RFC determination and, accordingly, also in the hypothetical presented to the vocational expert.  (*Id.* at 11-12).

The Commissioner responds that the ALJ properly considered Canales' cervical spine issues, cervical spine surgery, hip pain, and back pain.  (D.E. 17 at 5).  The

Commissioner contends that substantial evidence supported the ALJ's ultimate RFC determination, which accounted for Canales' limitations by limiting her to light work with additional restrictions. (*Id.*). Finally, the Commissioner argues that the hypothetical question posed to the vocational expert was proper because it included all of the limitations supported by the record and recognized by the ALJ. (*Id.* at 6).

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The burden has been described as more than a scintilla, but lower than a preponderance. *Id.*

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

RFC, which is determined between the third and fourth steps, is the most a claimant can do despite their limitations. 20 C.F.R. § 404.1545(a); *Perez*, 415 F.3d at 461-62. When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms. 20 C.F.R. § 416.945(a)(3). In making an RFC determination, the ALJ must consider the claimant's ability to regularly complete each of several strength demands, including sitting, standing, walking, lifting, carrying, pushing, and pulling. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The ALJ must include each of these findings in the hypothetical presented to the vocational expert. *Id.* at 621. Similarly, the hypothetical posed to the vocational expert must include all disabilities recognized by the ALJ or apparent in the record. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If it does not, then the vocational expert's testimony cannot be the basis of a not-disabled determination. *Id.*

"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). Further, even if the weight lifted is small, such work may involve a good deal of walking or standing, or involve sitting most of the time with some pushing or pulling. *Id.*

Here, the ALJ applied the appropriate legal standard when formulating the physical RFC determination. Among the impairments that the ALJ found to be severe were Canales' degenerative disc disease and degenerative joint disease. (D.E. 13-3 at 18). At the RFC stage of his analysis, the ALJ discussed the medical evidence regarding Canales' spine and hip impairments, including that she had a limited range of motion. (*Id.* at 22-

21

24).   However, the ALJ appropriately included various physical limitations in the RFC determination and explained why each was included.  (*Id.* at 25).   Specifically, the ALJ concluded that Canales was limited to light work and that, in addition, she: (1) could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; (2) could never climb ladders, ropes, or scaffolds; (3) only occasionally engage in bilateral overhead reaching; (4) required an option to alternate sitting and standing at 30 minute intervals; (5) needed a cane for ambulation; and (6) was required to avoid concentrated exposure to extreme cold temperatures, vibrations, and hazards.  (*Id.* at 21, 25).   Several of these limitations relate to Canales' spine and hip impairments, which were the focus of the ALJ's extensive review of the medical evidence.  *See* 20 C.F.R. § 416.945(a)(3) (stating that the ALJ must consider all relevant medical evidence).  Canales has not provided any authority to support the contention that the RFC determination had to include a specific limitation related to range-of-motion.   The ALJ addressed each of the required seven strength demands.  *Myers*, 238 F.3d at 620.

Moreover, the ALJ's RFC determination was supported by substantial evidence. The RFC determination was substantially similar to the conclusions reached by the state medical consultants at the initial and reconsideration stages.  (D.E. 13-4 at 10-11, 35-37). As noted by the ALJ, to the extent that the RFC determination differed from the conclusions reached by the medical consultants, it was to add more limitations, namely: (1) that Canales could never climb ladders, ropes, or scaffolds, even though the consultants said she could do so occasionally; (2) that she needed to alternate sitting and standing every 30 minutes, even though the consultants said she could sit or stand for up to 6 hours in a workday; and

22

(3) she needed a cane to ambulate, which the consultants did not address. (D.E. 13-3 at 26). These limitations were also supported by the medical record as a whole, including doctors noting that Canales was using a cane, and Canales' testimony at the hearing. (*See, e.g.,* D.E. 13-3 at 60-61, D.E. 13-17 at 12, 45). The evidence supporting the ALJ's decision qualifies as more than scintilla, but less than a preponderance. *See Perez*, 415 F.3d at 461.

Finally, the ALJ included all of these findings in the hypothetical question asked of the vocational expert as required. *Myers*, 238 F.3d at 620. Accordingly, it was not inappropriate to rely on the vocational expert's testimony. *See Boyd*, 239 F.3d at 707 (noting that a vocational expert's testimony cannot be the basis of a not-disabled determination where the hypothetical does not include all disabilities recognized by the ALJ or apparent in the record).

> b. *Whether the ALJ improperly substituted his own medical opinion for the opinions of the state agency psychological consultants when he rejected their conclusions about Canales' mental limitations*

Next, Canales contends that the ALJ improperly rejected the opinions of two state agency psychological consultants, who concluded that, based on her mental impairments, Canales retained the ability to understand, remember, and carry out detailed but not complex instructions. (D.E. 16 at 12-13). She argues that the ALJ found other medical opinions regarding her mental limitations to be persuasive, but the RFC determination nonetheless failed to include limitations identified in these opinions, including limitations to her ability to stay on task or work at a sustained rate and to her ability to effectively control, regulate, and modulate her behavior and emotions in a work setting. (*Id.* at 13). She also asserts that the ALJ found that she had a moderate limitation with regard to

23

concentrating, persisting, or maintaining pace, but concluded in the RFC determination that she could attend and concentrate for two hours at a time without addressing whether she could maintain pace.  (*Id.* at 15-16).

The Commissioner responds that substantial evidence supported the ALJ's mental RFC determination, which was based on the record as a whole.  (D.E. 17 at 6).  The Commissioner argues that the ALJ properly included RFC limitations related to the finding that Canales had a moderate limitation in her ability to concentrate, persist, and maintain pace.  (*Id.* at 7).  Specifically, the Commissioner contends that the limitation in her ability to attend and concentrate for two hours at a time accounted for her ability to maintain pace. (*Id.*).

If the ALJ finds that a claimant has a severe mental impairment that does not meet or equal an impairment listed in the appendix to the regulations, the analysis then moves to an RFC assessment.  20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).  When evaluating a claimant's mental RFC, the ALJ considers factors "such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting."  *Id.* § 416.945(c).

The ALJ has a duty to fully and fairly develop the facts.  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  The opinions, diagnoses, and medical evidence of a treating physician should be given considerable weight in determining disability.  *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  However, the ALJ does not defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  In determining what weight to give each medical

opinion or prior administrative medical finding, the ALJ considers several factors, including consistency and supportability. *Id.* The ALJ is not required to adopt any prior administrative medical findings, but must consider that evidence. *Id.* §§ 404.1513a(b)(1), 416.913a(b)(1). Further, the ALJ should not substitute his lay opinion for the medical opinion of experts, especially in cases of mental disability. *Salmond v. Berryhill*, 892 F.3d 812, 818 (5th Cir. 2018).

Here, the ALJ found only Dr. Klaas' mental health opinions to be fully persuasive, but then failed to adequately address Dr. Klaas' opinions in the RFC determination. It appears from the ALJ's discussion of the mental health medical records that he based his RFC determination primarily on the opinions of Dr. Klaas, which the ALJ found persuasive because they were consistent with the medical records. (D.E. 13-3 at 26-27). In contrast, he found the opinions of the state agency medical consultants to be not very persuasive because they failed to include any social limitations, and he found Dr. DuBois's opinion to be not persuasive because the extreme limitations were not supported by the record. (*Id.*). Canales does not contend that the ALJ's reliance on Dr. Klaas was misplaced, but rather asserts that the ALJ's RFC determination failed to adequately address even the limitations found by Dr. Klaas. (*See* D.E. 16 at 12-16). She is correct.

The ALJ's RFC determination failed to account for two of the findings in Dr. Klaas' report. First, Dr. Klaas concluded that Canales' concentration was maintained, but she struggled with details, staying on tasks, and working at a sustained rate. (D.E. 13-12 at 49). The only limitation in the RFC determination that could arguably address this conclusion is the ALJ's finding that Canales could attend and concentrate for two hours at

a time. (D.E. 13-3 at 21). However, this limitation does not address Canales' ability to maintain pace, only to concentrate and attend. Moreover, it is unclear where the two-hour limitation came from. Dr. Klaas did not indicate that Canales could concentrate, persist, or maintain pace for up to two hours, nor did any of the other medical opinions. (*See* D.E. 13-12 at 46-49).[3] The ALJ may not substitute his lay opinion for the medical opinions of experts, and it is unclear how he reached the conclusion that Canales could attend and concentrate for up to two hours at a time. *See Salmond*, 892 F.3d at 818. Second, Dr. Klaas concluded that Canales had constraints in being able to effectively control, regulate, and modulate her behavior and emotions and maintain her well-being in a work setting. (D.E. 13-12 at 49). Despite this conclusion, the RFC determination indicates that Canales could respond appropriately to occasional, routine changes in a work setting. (D.E. 13-3 at 21). This limitation was consistent with the opinions of the state agency medical consultants, but the ALJ stated that he found those opinions to be not very persuasive. (D.E. 13-4 at 14, 39; D.E. 13-3 at 26).

The ALJ was not required to defer or give specific evidentiary weight to any one medical opinion. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). However, in the ALJ's own explanation of the RFC determination, he stated that Dr. Klaas' report was the only mental health opinion in the record that he found to be fully persuasive. (D.E. 13-3 at 26-27). Despite this statement, the RFC determination failed to include limitations consistent with

---

[3] The state agency medical consultants concluded that Canales could "attend and concentrate for extended periods," but did not define what qualified as an extended period. (D.E. 13-4 at 14, 39). Regardless, the ALJ found their opinions to be not very persuasive. (D.E. 13-3 at 26).

Dr. Klaas' opinions and seemingly discounted them.  An ALJ may not discount every medical opinion and instead rely on his own opinion regarding the limitations posed by the applicant's medical conditions.  *See Ripley*, 67 F.3d at 557.  Because it is unclear, at the very least, how the ALJ reached his RFC determination related to Canales' mental impairments, the RFC determination was not supported by substantial evidence.

## IV.  RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Canales' motion for summary judgment (D.E. 16) be GRANTED, the Commissioner's motion for summary judgment (D.E. 17) be DENIED, and the Commissioner's denial of disability benefits be REVERSED AND REMANDED for further consideration.

Respectfully submitted on October 12, 2021.

_____
Julie K. Hampton
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).